OPINION
Defendant-appellant, Tammie L. Brooks, appeals from a judgment of the Franklin County Court of Common Pleas based on a jury verdict finding defendant guilty of one count of child endangering involving Hayden (a/k/a Haden) Childers, a seven-month-old infant, in violation of R.C.2919.22(A), and one count of child endangering of Hayden in violation of R.C. 2919.22(B)(1). The jury was unable to reach a verdict on five additional counts against defendant concerning the injury and death of another child, Joshua, and a mistrial was declared on those counts. We affirm the trial court's judgment.
According to the state's evidence, on May 6, 1999, Serena Childers began using defendant as a daycare provider for her two children, four-and-half-year-old Derrick and seven-month-old Hayden. Childers would drop the children off at defendant's home at 7:30 a.m. and pick them up about 1:00 p.m. When she picked up the children on May 11, 1999, Hayden had a purplish bruise underneath one eye. Both Childers and her husband recalled thinking it looked like a "black eye." Defendant told her that Hayden had scratched himself.
Childers was concerned about defendant's care of Hayden so she arrived early, unannounced, on May 12 to pick up her children. She found five children, including Hayden, unattended in a playroom. She took Hayden out of a swing in which he was sitting and gave him a bottle for ten minutes before defendant finally walked into the room. While Childers was waiting for defendant, one of the children accidentally knocked over the swing in which Hayden had been sitting. Hayden did not exhibit any fussiness or cause for concern that day.
When Childers dropped Hayden off at defendant's home at 7:30 a.m. on May 13, Hayden was acting normally. When Childers arrived at 1:00 p.m. to pick up her children, defendant, holding Hayden, informed Childers that Hayden had been "fussy" for about a half hour to an hour; defendant attributed Hayden's behavior to possible constipation. Childers remained for about ten minutes and held Hayden who, fussy and whining, vomited on her. Defendant did not mention any injury Hayden may have received while he was at defendant's home that day.
Childers took her children home and, believing Hayden was simply ill, laid Hayden down for a nap. When she laid him down she caressed his head and noticed the left side of his head was "very, very soft," like "mush." (Tr. VI, 823.) Concerned, she tried to reach her family doctor but he was not in his office. Childers alerted her husband, who was home, regarding Hayden's condition and left for a scheduled 2:00 p.m. appointment to register Derrick for kindergarten. On her return an hour later, her husband informed her that Hayden had awoken a half hour after she left and had projectile vomiting. At that point, Childers paged her family doctor, who called her back at about 4:00 p.m. and advised her to take Hayden to the hospital. Hayden vomited on the way to the hospital and again when they arrived at the hospital.
On his admission to the hospital emergency room, Hayden had (1) a head injury with a large cephalhematoma, an area of soft tissue swelling on his scalp with blood collected between his skull and skin, (2) an acute subdural hematoma, or bleeding inside the brain, over his left brain surface and between the hemispheres of his brain, and (3) large retinal hemorrhages throughout both eyes. Hayden had no fractures and no bruises other than a bluish coloration on the soft tissue swelling on his skull. Hayden vomited in the emergency room, was irritable and fussy for the next couple of days, but then had a good recovery. He remained in the hospital for four days.
Dr. Elizabeth Gilles, a pediatrician and child neurologist, testified for the state as an expert in pediatric child abuse. After reviewing Hayden's medical records and CT scans, Dr. Gilles opined to a reasonable degree of medical certainty that Hayden exhibited "shaken baby syndrome," which she termed "inflicted head injury." She defined the syndrome as the presence of subdural hematomas, retinal hemorrhages and brain injury which are caused by shaking and, frequently, impacts on an infant.
According to Dr. Gilles' testimony, the large soft swelling on Hayden's scalp was caused by an impact with a "shearing" component that tore the periosteum, the tissue on top of the skull, off the bone. An impact alone would have been inadequate to create Hayden's condition. Rather, a forceful rotational component, such as a hard hit or kick, also was necessary to cause the subdural hematoma observed in Hayden. Dr. Gilles was aware the investigating social worker's history stated Derrick told Childers that defendant kicked Hayden in the head. Dr. Gilles found it is possible that if Hayden was "lying on the ground and his body would be fairly stationary and kicked hard, that would give you the momentum to whiplash the head sideways, and that also can generate a subdural and concussion," and retinal hemorrhages if it was significant enough. (Tr. II, 159-160.)
Dr. Gilles' testimony further indicated Hayden's medical findings were not consistent with defendant's proffered explanation that an accident or something, perhaps a swing, fell on Hayden. While subdural hematomas, particularly the interhemispheric bleeding present in Hayden, and retinal hemorrhages are commonly seen in abused babies with inflicted head injury, she stated they only rarely occur as the result of accidental injuries, even in children who are severely injured in accidents. Moreover, although subdural hematomas and retinal hemorrhages are seen in many contexts and may result from conditions other than an impact, Dr. Gilles testified those other conditions did not exist here. As Dr. Gilles explained, Hayden's injuries could not have happened from something falling on him, because no rotational component, a necessary element to cause Hayden's subdural hematomas and retinal hemorrhages, would have been present; instead, a depressed skull fracture would have been more likely. As a result, the injury which caused Hayden's internal trauma could not have resulted from the external bruise that was observed under his eye. Finally, noting that Hayden became symptomatic outside his home, Dr. Gilles stated that immediately after receiving his concussive injury, Hayden would have exhibited the symptoms, including the large "mushy" soft spot on his head, and the combination of vomiting, irritability, and sleepiness.
Dr. Charles Johnson, a professor of pediatrics at Ohio State University and director of the child abuse program at Children's Hospital, also testified for the state as an expert on child abuse. According to his testimony, he was asked to consult on the case, he examined Hayden the day after Hayden's admission to the hospital, and he reviewed Hayden's medical charts and history. Dr. Johnson noted the presence of Hayden's subdural hematoma, large retinal hemorrhaging, and soft tissue swelling on his scalp, and he observed that the bruise under Hayden's eye did not look like a scratch. Dr. Johnson's impression was that Hayden had suffered an impact to his head, but that no incident of trauma was reported and no explanation was given for the soft spot swelling or the internal bleeding. Noting that defendant reportedly babysat six or seven children, Dr. Johnson "felt there were too many children in the baby-sitter's home * * * for adequate supervision." (Tr. IV, 428.) Under those circumstances, he felt it was appropriate to suspect child abuse.
According to Dr. Johnson, Hayden's having both retinal hemorrhages and subdural hemorrhages was diagnostic of shaken baby syndrome, which "to me means the baby's head impacted with a shaking component to it." (Tr. IV, 435-436.) Dr. Johnson explained Hayden's large retinal hemorrhages indicated an acceleration/deceleration injury that occurs when an infant's head is shaken or impacted, causing the brain to move around inside the skull and accelerate from the shaking until it "stops by banging into the skull as it moves around, or its contents, and then it comes back again." (Tr. IV, 442.) The amount of force required in a shaking to cause retinal hemorrhage is "more than any of us would consider appropriate for an infant * * * [i]t is considerable." (Tr. IV, 441.) According to Dr. Johnson, acceleration/deceleration injury can be caused by a blow on the side of a child's head or "throwing a child against a wall or into bed, where there is not a mark on the child, but the brain keeps going as a result of being accelerated until it stops." (Tr. IV, 443.)
Dr. Johnson excluded Hayden as the cause: "[t]he child could not have done these things to himself." (Tr. IV, 426.) Rather, the cause of Hayden's injuries was an intentional trauma and "[n]o other cause could explain the findings in this particular child." (Tr. IV, 440-441.) Dr. Johnson acknowledged that it is "possible" that Hayden's injuries could have occurred from a heavy object falling on his head, but he found nothing in Hayden's history to indicate he sustained the injuries as the result of an accident or fall. Moreover, retinal hemorrhages are not expected as the result of resuscitation efforts or a mild bump, and they only rarely result from a severe injury, such as a head hitting a dashboard in a car accident. Although Dr. Johnson noted that the potential causes of retinal hemorrhages are infection, a bleeding disorder, a direct blow to the eye, or a crushing chest injury, Dr. Johnson ruled them out in Hayden's case.
Lastly, Dr. Johnson stated "[i]t is unlikely this kind of injury would have occurred without the babysitter knowing it. The child would have been quite irritable after the injury took place." (Tr. IV, 427.) To determine when the injury occurred, Dr. Johnson would see when the child last seemed normal and when abnormal symptoms first arose, such as vomiting, irritability, and lethargy.
Dr. Audreas Plioplys, a child neurologist, testified for the defense. According to his testimony, he reviewed Hayden's medical record and CT scans, and agreed with the other physicians that Hayden (1) had retinal hemorrhages caused by shaking, or acceleration/deceleration with rotation, and (2) had a subdural hematoma caused by direct trauma. Dr. Plioplys opined that to a reasonable degree of medical certainty Hayden suffered at least one infliction of harm or trauma, together with the shaking that took place.
According to Dr. Plioplys, Hayden's injuries could have been caused by a fairly heavy object striking Hayden's head, by Hayden coming into contact with a wall or other hard object while someone was shaking him, or from someone kicking his head. He "basically agree[d] with Dr. Johnson" as to how Hayden's injuries may have occurred. Moreover, he agreed it was most likely Hayden was injured on the same day he was diagnosed with his injuries. He noted no swelling was detected in the morning and, due to the prominent finding of swelling on the brain scan, he believed it would have been noticed had it been present.
Additional undisputed evidence revealed that in an interview with a detective on May 15, 1999, defendant had no explanation for how Hayden could have received his head injury; defendant did not then suggest that he had been struck by a swing. In a May 14, 1999 interview with a Children Services caseworker, defendant likewise offered no explanation for Hayden's injuries. Only in a subsequent interview with the caseworker on May 18, 1999, held after defendant's interview with the police detective, did defendant suggest the possibility that Hayden may have been in a swing and may have been pushed over when another child made the swing fall; defendant, however, admitted she did not see such an incident. Despite her suggestion, the record is unclear whether defendant's explanation referred to the May 12 incident involving the swing which Childers observed, or to a new incident on May 13, the day Hayden was injured.
Extensive evidence was presented at trial regarding allegations that (1) defendant was guilty of child endangering as to Joshua, another infant in her care, on March 11 and August 31, 1999, and (2) defendant caused his death on August 31, 1999. Eight medical experts testified regarding Joshua, including the three medical experts who testified regarding Hayden.Defendant did not testify on her own behalf and presented no witnesses in her defense other than Dr. Plioplys.
Following the conclusion of an approximately three-week trial and ten days of jury deliberations, the jury found defendant guilty of two counts of child endangering regarding Hayden in violation of R.C. 2919.22(A) and (B)(1). It also found defendant's actions resulted in "serious physical harm" to Hayden pursuant to R.C. 2901.01(A)(5), causing the offenses to be elevated to third degree and second degree felonies, respectively. R.C. 2919.22(E)(2)(c) and (d). The two counts were merged into one second degree felony for purposes of sentencing, and the trial court sentenced defendant to eight years in prison. The jury was unable to reach a verdict as to any of the charges concerning Joshua. Defendant appeals from the convictions regarding Hayden, assigning the following errors:
 I. THE VERDICT OF THE JURY FINDING APPELLANT GUILTY OF TWO CHARGES OF CHILD ENDANGERMENT PURSUANT TO R.C. § 2919.22 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. THE CONVICTION OF APPELLANT ON TWO COUNTS OF CHILD ENDANGERMENT IN VIOLATION OF R.C. § 2919.22 WAS BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.
 III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION AND RENEWED MOTION TO SEVER THE CHARGES AGAINST APPELLANT REGARDING (HAYDEN) CHILDERS FROM THE CHARGES AGAINST JOSHUA CROSS.
 IV. PLAIN ERROR OCCURRED AT TRIAL THAT VIOLATED APPELLANT'S FIFTH AMENDMENT RIGHT TO A FAIR TRIAL WHEN A LETTER CONTAINING INADMISSIBLE CHARACTER EVIDENCE REGARDING APPELLANT WAS INADVERTENTLY SUBMITTED TO THE JURY AS A PART OF APPELLEE'S EXHIBIT 1A.
 V. APPELLANT'S CONSTITUTIONAL RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT AND RIGHT TO A FAIR TRIAL UNDER THE FIFTH AMENDMENT WAS VIOLATED WHEN APPELLANT'S COUNSEL FAILED TO OBJECT TO, OR REDACT, THE PREJUDICIAL LETTER FOUND IN APPELLEE'S EXHIBIT 1A.
 VI. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED DR. JAMES YATES TO TESTIFY AS AN EXPERT WITNESS ON BEHALF OF APPELLEE BECAUSE THE STATE FAILED TO ADEQUATELY DISCLOSE THEIR INTENTION TO DISCLOSE THIS WITNESS TO APPELLANT PURSUANT TO CRIM.R. 16.
Defendant's first and second assignments of error contend the child endangering convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Specifically, defendant asserts a rational trier of fact could not have concluded beyond a reasonable doubt that defendant either recklessly violated a duty of care owed Hayden or purposely abused him. Defendant concedes the state's evidence indicated Hayden suffered trauma that caused a subdural hematoma and retinal hemorrhages, which may have occurred while Hayden was in her care. Defendant contends, however, that at best the evidence was circumstantial, and demonstrates only that Hayden suffered possible non-accidental or accidental trauma while in defendant's care but does not establish the mens rea requirements set forth in R.C. 2919.22(A) and (B).
Under R.C. 2919.22(A), the state was required to prove beyond a reasonable doubt that (1) defendant was the parent, guardian, custodian, person having custody or control, or person in loco parentis of the subject child, and (2) defendant recklessly violated a duty of protection, care or support imposed by law which created a substantial risk to the health or safety of the child. State v. McGee (1997),79 Ohio St.3d 193; see, also, State v. Miley (1996), 114 Ohio App.3d 738,743. Defendant does not contest the jury's additional finding that her conduct resulted in serious physical harm to the child.
A conviction under R.C. 2919.22(B)(1) required the state to prove beyond a reasonable doubt that (1) the child was under eighteen years of age or was a mentally or physically handicapped child under twenty-one years of age, (2) an affirmative act of abuse occurred, and (3) defendant recklessly committed the act of abuse. State v. Burdine-Justice (1998),125 Ohio App.3d 707, 713; State v. Ivey (1994), 98 Ohio App.3d 249, 257. Again, defendant does not challenge the jury's finding that serious physical harm resulted to the child.
The culpable mental state for the crime of endangering children under both statutory subsections is recklessness. McGee, supra, at 195. Pursuant to R.C. 2901.22(C), "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result[.]" "* * * When recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." R.C. 2901.22(E). Defendant challenges the sufficiency of the state's evidence of recklessness.
When presented with a sufficiency of the evidence argument, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported.
According to the state's evidence, Hayden was a healthy seven-month-old infant at the time he was entrusted to defendant's care. The medical experts agreed Hayden suffered one or more significant blunt force traumas to his head, with a shaking or rotational component to the trauma, that resulted in injuries characteristic of shaken baby syndrome, or inflicted head injury: subdural hematoma, including interhemispheric bleeding, large retinal hemorrhages in both eyes, and a large area of surface swelling on his scalp with no other bruising and no fractures. While under defendant's care, Hayden first exhibited the symptoms indicating his injuries, including vomiting and irritability. The medical experts testified those symptoms would have become apparent immediately or soon after Hayden received his injuries.
Moreover, Drs. Gilles and Johnson testified that although subdural hematomas and retinal hemorrhages are commonly seen in abused babies with inflicted head injuries, they only rarely occur as the result of an accident or some other condition. As a result, both medical experts opined Hayden's injuries did not result from an accident or other non-accidental cause. Rather, Dr. Johnson specifically declared the cause of Hayden's injuries as an intentional trauma; Dr. Plioplys "basically agreed" with Dr. Johnson's assessment. Moreover, all three medical experts testified Hayden's injuries could have occurred as the result of either a forceful blow or kick to his head, or a shaking that caused Hayden to make contact with a wall or other hard object. Consistent with one of the proffered explanations for Hayden's injuries, Hayden's four-and-half-year-old brother apparently reported to Childers that defendant had kicked Hayden in the head.
Based on the foregoing evidence, the jury could have reasonably inferred defendant recklessly abused Hayden or failed to protect him from serious physical harm while he was in her care. Ample evidence was presented to allow the jury to rationally find Hayden's injuries, characteristic of shaken baby syndrome, occurred as the result of an intentional infliction of a significant force. The jury could further rationally infer that defendant, as the sole caregiver at the time Hayden became symptomatic, was the person responsible for Hayden's injuries, and that defendant either inflicted the injury herself to Hayden's head or failed to protect Hayden from such injury.
While defendant argues no direct evidence was presented that defendant abused Hayden, it is well-settled that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." State v. Gulertekin (Dec. 3, 1998), Franklin App. No. 97APA12-1607, unreported, citing Jenks, supra. Moreover, it is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained. See Gulertekin, supra (sufficient circumstantial evidence to support conviction of child endangering where an infant suffered injuries consistent with shaken baby syndrome while entrusted to the defendant's care); State v. Williams (Mar. 5, 1992), Franklin App. No. 91AP-653, unreported (sufficient circumstantial evidence to support conviction of child endangering where there was medical expert testimony that an infant was injured as the result of abuse and where the defendant was the primary caretaker of the infant immediately proceeding the manifestation of the infant's injuries); State v. Kirk (Mar. 24, 1994), Franklin App. No. 93AP-726, unreported; State v. Banks (June 3, 1993), Franklin App. No. 92AP-859, unreported; State v. Wright (1986), 31 Ohio App.3d 232. See, also, State v. Munici (Nov. 19, 1987), Cuyahoga App. No. 52579, unreported.
Defendant, however, contends the facts here are analogous to those in State v. Miley (1996), 114 Ohio App.3d 738, where the court of appeals held the circumstantial evidence to be insufficient to prove child endangering. There the defendant and the infant's mother were the only persons who had access to and cared for the infant during the time the infant suffered severe internal injuries. Miley is distinguishable. In Miley, either the defendant or the infant's mother could have committed the abuse or failed to prevent the abuse of the infant. In reversing the defendant's conviction in Miley, the court of appeals noted, "[a] fifty percent possibility does not satisfy the standard of beyond a reasonable doubt." Id. at 744. By contrast, defendant here was the sole caregiver during the time Hayden could have suffered his injuries. The jury accordingly could have concluded that defendant abused Hayden or recklessly violated a duty of care to prevent serious harm to him during the time Hayden was in defendant's sole care.
Construed in the state's favor, the evidence was sufficient to allow the jury to find beyond a reasonable doubt that defendant violated R.C.2919.22(A) and (B)(1).
Defendant also asserts the verdict is against the manifest weight of the evidence. As in her allegation of error regarding the sufficiency of the evidence, defendant acknowledges that at best the weight of the evidence presented at trial demonstrates Hayden's injuries likely, but not definitely, occurred while Hayden was under defendant's care. Defendant, however, asserts the weight of the evidence does not satisfy the mens rea requirement of recklessness or purpose under R.C. 2919.22; she contends the presence of retinal hemorrhages and a subdural hematoma is, in and of itself, insufficient to prove that defendant abused Hayden.
When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence"). Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230.
In support of her assigned error, defendant asserts the expert testimony of Drs. Johnson and Plioplys reveals that Hayden's retinal hemorrhages and subdural hematoma could have been caused by some sort of accidental impact to Hayden's head.
While both Drs. Johnson and Plioplys acknowledged injuries like Hayden's possibly could have occurred from a heavy object falling on the infant's head, Dr. Johnson specifically dismissed that possibility, noting nothing in Hayden's history indicated he sustained the injuries as the result of an accident or fall. Dr. Johnson considered but ruled out other potential conditions that could have caused the retinal or brain bleeding in Hayden. He specifically testified the cause of Hayden's injuries was an intentional trauma, and "[n]o other cause could explain the findings in this particular child." Dr. Plioplys, defendant's sole expert, testified he basically agreed with Dr. Johnson's evaluation of Hayden's case concerning how and when Hayden's injuries occurred.
We recognize evidence also was presented that defendant had too many children under her care for adequate supervision, and defendant left the children unattended for at least ten minutes at a time. During one such occasion, on the day before Hayden suffered his injuries, a swing fell over in the room where the children were playing. None of the children were hurt in the incident, but defendant did not remove the swing. Nevertheless, other than defendant's belated speculation that Hayden could possibly have received his injuries while in the swing, no evidence was presented that Hayden was in the swing on the day he was injured or that the swing in fact fell over that day.
As the trier of fact, the jury was required to determine the credibility of the witnesses and the weight to be accorded their testimony. DeHass, supra. A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. State v. Kendall (June 29, 2001), Franklin App. No. 00AP-1098, unreported. The jury could properly believe the testimony of the medical experts that Hayden's retinal hemorrhages and subdural hematoma were caused by a forcefully inflicted trauma, rather than an accidental trauma.
Defendant next asserts Dr. Johnson did not base his medical opinion about the cause of Hayden's injuries solely on the facts presented at trial but instead had a "predisposition" to equate Hayden's injuries with child abuse and "formed his opinion in the context of Joshua Cross's injuries." Defendant's contention is unpersuasive: defendant presents only bare, unsupported allegations which the record does not substantiate. The record contains ample support for Dr. Johnson's opinion concerning Hayden, without regard to the evidence concerning Joshua.
Lastly, defendant asserts the state failed to prove beyond a reasonable doubt whether Hayden was injured during the time he was in defendant's care, or during the subsequent three hours he was in the care of his parents.
The evidence was undisputed that Hayden appeared well and normal when he went into defendant's care on May 13, 1999. Defendant asserts that if Hayden had been injured during defendant's care, he would have immediately exhibited the following symptoms described by Dr. Gilles in her testimony: "continuously symptomatic, looked terrible, not breathing well, often vomit, may seize, typically limp, pale, and unresponsive." (Tr. II, 108.) Defendant's assertion is misplaced because in listing those symptoms Dr. Gilles was discussing symptoms of a severe or fatal injury arising from shaken baby syndrome, such as Joshua, not Hayden, sustained. The medical testimony was quite clear that Hayden's injuries were not as severe as Joshua's. Drs. Gilles and Johnson both testified that the onset of symptoms expected immediately in a child with an injury like Hayden's included vomiting, irritability, and sleepiness, all of which were present at the time or soon after Childers picked up Hayden from defendant's care. Thus, the evidence was undisputed that Hayden was already symptomatic at the time he went back into his parents' care shortly after 1:00 p.m. on May 13. Moreover, only a half hour later Childers noticed the large "mushy" spot that further manifested the direct trauma to Hayden's head.
Where medical testimony was presented at trial that Hayden would have been symptomatic immediately upon being injured, and the evidence revealed that Hayden first exhibited symptoms indicative of his injuries while under defendant's sole care, the jury could properly believe that Hayden sustained his injuries while in defendant's care, as opposed to the time period he was in the care of his parents.
Substantial competent, credible evidence was presented by which the jury reasonably could find defendant recklessly or intentionally abused Hayden and recklessly failed to protect him from serious physical harm. The jury's verdict is not against the manifest weight of the evidence, and we decline defendant's invitation to overturn her convictions solely on the basis of policy. Accordingly, defendant's first and second assignments of error are overruled.
Defendant's third assignment of error contends the trial court abused its discretion in denying defendant's motion to sever trial of the offenses involving Joshua from the offenses involving Hayden. Defendant asserts that, given the highly emotional and sometimes gruesome nature of the evidence, the jury could not have separated the evidence regarding Hayden from the evidence concerning the tragic death of Joshua, all to defendant's prejudice.
In addition to the two counts charging defendant with child endangering related to Hayden on May 13, 1999, the indictment charged defendant with various counts regarding offenses against Joshua, including two counts of child endangering of Joshua on March 11, 1999, two counts of child endangering of Joshua on August 31, 1999, and two counts of involuntary manslaughter and one count of murder for the death of Joshua on August 31, 1999. One count charging child endangering and one count charging involuntary murder of Joshua on August 31, 1999 ultimately were dismissed.
Pursuant to Crim.R. 8(A), joinder of multiple offenses is permitted when the charged offenses are "of the same or similar character * * * or are part of a course of criminal conduct." Joinder of offenses is favored, as a general rule, to prevent successive trials, to conserve judicial resources, and to diminish inconvenience to the witnesses. State v. Torres (1981), 66 Ohio St.2d 340, 343. However, "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts * * *." Crim.R. 14. "Weighing the danger of confusion and undue cumulative inference is a matter for the trial judge within his sound discretion. His denial of severance is not grounds for reversal unless clear prejudice and abuse of discretion is shown." Johnson v. United States (C.A.8, 1966), 356 F.2d 680, certiorari denied, 385 U.S. 857. To prevail on her contention that the trial court abused its discretion in denying her motion to sever, defendant must affirmatively demonstrate:
 (1) [T]hat [her] rights were prejudiced, (2) that at the time of the motion to sever [s]he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. State v. Schaim (1992), 65 Ohio St.3d 51, 59.
In analyzing defendant's claim that her rights were prejudiced, we "must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." Id. at 59.
Defendant initially asserts that in a hypothetical separate trial of the offenses concerning Hayden, the evidence regarding Joshua would have been inadmissible "other acts" evidence under Evid.R. 404(B), because the evidence regarding Joshua would have been offered solely to imply that defendant acted in conformity with the charges against her regarding Hayden.
The admissibility of other acts evidence is limited. The use of other acts evidence creates the danger that the jury will convict a defendant "solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged * * *." Id. See, also, State v. Curry (1975),43 Ohio St.2d 66, 68. Nonetheless, other acts evidence may be admitted if the evidence pertains to "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). See, also, R.C. 2945.59.
A central tenet of the defense was that Hayden's injuries, if they occurred while Hayden was under defendant's care, were accidental. Thus, because "accident" was materially at issue as to the cause of Hayden's injuries, the evidence regarding Joshua arguably would have been independently admissible in a separate trial concerning Hayden to show an "absence of accident" in the injuries Hayden received. Evid.R. 404(B); R.C. 2945.59. See U.S. v. Leight (1987), 818 F.2d 1297, certiorari denied, 484 U.S. 958 (concluding that evidence of mother's alleged abuse of her two older children was admissible in prosecution of mother for murder of youngest child to show absence of mistake or accident), and U.S. v. Woods (1973), 484 F.2d 127, 133-135, certiorari denied (1974),415 U.S. 979 (concluding that when crime is child abuse, evidence of defendant's alleged abuse of other children admissible to prove that the acts alleged were not accidental).
Even if the evidence was not admissible as other acts evidence, joinder may be appropriate if the evidence is simple and distinct. Defendant contends the evidence regarding the children's injuries was not "simple," but instead was complex and consisted of highly technical medical testimony from eight medical experts and several hundred pages of medical records, including CT scans of both children. Defendant further asserts the evidence for each child was not "distinct," because each body of evidence involved a small child who was supervised by defendant during approximately the same time frame in 1999 and who exhibited symptoms indicative of shaken baby syndrome, including retinal hemorrhages and subdural hematomas.
In denying defendant's motion to sever, the trial court concluded the evidence against defendant regarding Hayden and Joshua, although not simple, was distinct for each child. Noting the key issue was whether the jury would be confused by hearing evidence from the same experts concerning the two children in the case, the court concluded the jury would not be unduly confused because the charged offenses involved different victims, different dates, and different issues.
At trial, the court and counsel were careful in keeping the evidence separate and distinct concerning each child. Of the eight medical experts, five testified regarding only Joshua; the remaining three medical experts testified regarding both children. Apart from general medical testimony, and with minor exceptions, those three medical experts presented their findings and conclusions regarding one child's injuries before proceeding with testimony concerning the other child's injuries. Notably, after Drs. Gilles and Johnson testified on direct examination regarding Hayden's injuries, the court declared a ten minute recess before those witnesses proceeded with their testimony regarding Joshua. Similarly, defense counsel first questioned Dr. Plioplys concerning Hayden and completed that line of questioning before distinctly moving into a separate line of questioning regarding Joshua. While on a few occasions the witnesses and counsel mistakenly referred to one child where they meant to refer to the other child, the mistakes were corrected and the testimony clarified for the jury.
Further, during trial and again in its final instructions to the jury, the court instructed the jury to regard the children and the incidents surrounding them separately and distinctly and to consider the evidence regarding each child separately. A jury is presumed to follow the trial court's instructions. State v. Jones (2000), 90 Ohio St.3d 403, 414, stay granted (2001), 91 Ohio St.3d 1435. The trial court's instructions substantially reduced the danger of the jury confusing or improperly cumulating the evidence. See State v. Dickens (Apr. 12, 1983), Franklin App. No. 81AP-1003, unreported; Drew v. United States (D.C. Cir. 1964),331 F.2d 85, 91. Moreover, in its final instructions to the jury, the trial court enumerated each count separately as to each child, instructing the jury on counts one and two concerning Hayden and then instructing the jury on the five remaining counts concerning Joshua. The jury was given separate verdict forms for each count.
In the final analysis, defendant has not demonstrated the trial court abused its discretion in denying her motion to sever, as joinder is not prejudicial where the evidence can reasonably be separated as to the claimed offenses. Torres, supra, at 344. Here, the evidence presented at trial reasonably could be separated as to the offenses regarding Hayden and those regarding Joshua. Indeed, the lack of prejudice arising from joinder of the counts at trial is evidenced by the jury's finding defendant guilty of the offenses regarding Hayden, but not finding defendant guilty of any of the offenses regarding Joshua. Defendant's third assignment of error is overruled.
Defendant's fourth assignment of error contends plain error occurred when a letter was inadvertently submitted to the jury as part of a prosecution exhibit containing extensive medical records of Joshua.
The letter, dated October 4, 1999, from Dr. Johnson to the Franklin County Sheriff's office, briefly reviewed Joshua's medical history, concluded the injuries leading to his death were consistent with "acceleration/deacceleration injury," and preliminarily explored concerns and possible causes for Joshua's injuries. The last two paragraphs of the letter state as follows:
 Of concern is the fact that another child in the care or [sic] this babysitter named Haden Childers, 7 months old, was also admitted to Children's Hospital with a black eye and found to have retinal hemorrhage and subdural hemorrhages consistent with a diagnosis of acceleration/deacceleration injury. That child was returned to its parents and continues to do well at home. This child was not returned to the original babysitter.
 We are concerned about the history of children that are in the care of Tammy Brooks, in that she has been responsible for the care of more children at the same time than is legally allowed in our state. In addition, three serious head injuries, one resulting in a child's death, have occurred while children were in her care. I also understand that she has a past history of child abuse of her own children as well as children she has babysat for in the past. I understand that an injunction is being sought to prevent her taking care of children in the future.
Defendant contends that contrary to Evid.R. 404, the second paragraph contains inadmissible and damaging character evidence regarding defendant. Claiming the statements in the letter are "wholly unsubstantiated," defendant initially takes issue with the statement that "three serious head injuries, one resulting in a child's death, have occurred while children were in her care." The reference presumably is to the head injury of Hayden on May 13, 1999, and the head injuries of Joshua on March 11 and August 31, 1999. Whether those injuries occurred while the children were in defendant's care was at issue in defendant's trial, and competent evidence on the issue was admitted through the testimony of various witnesses and exhibits at trial. Thus, contrary to defendant's assertion, the statement was not wholly unsupported by other competent evidence at trial.
The references in the next sentence are more troubling because they advise that "she has a past history of child abuse of her own children as well as children she has babysat for in the past." Evid.R. 404(A)(1) provides that evidence of a character trait of the accused is generally not admissible unless the defendant first opens the door to such character evidence. Whether defendant has a history of child abuse of her own or other children was not at issue or in evidence in the instant trial. Moreover, defendant did not open the door to admission of such character evidence.
The prohibition on character evidence in Evid.R. 404 is based on the recognition that character evidence usually has slight probative value but has a large potential for prejudice. Banks, supra. The state properly concedes the statement contains inadmissible information.
However, even if error occurred in the submission of inadmissible character evidence to the jury for its consideration, defendant must demonstrate the error was prejudicial. Error is prejudicial when it adversely affects substantial rights of the accused. Crim.R. 52(A); State v. Brown (1982), 7 Ohio App.3d 113; Banks, supra. For non-constitutional errors, as here, the evidence of defendant's guilt must be substantial to hold that the error was not prejudicial. See State v. Davis (1975),44 Ohio App.2d 335, 347.
Defendant contends the jury could not have ignored the prejudicial character evidence concerning defendant's alleged prior child abuse. Moreover, defendant asserts the evidence presented at trial in this case was inconclusive and, when considered without the prejudicial character evidence contained in the letter, could not have convinced the jury defendant violated a duty of care or abused Hayden.
In support of her contentions, defendant presents to this court copies of two juror affidavits attesting that the jurors reviewed and considered the subject character evidence during their deliberations. Evid.R. 606(B) states, in pertinent part: "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict[.]" The affidavits proffered by defendant do not fall within an exception to the general rule. Id. As a result, the proffered affidavits may not be considered in our decision, as a juror may not impeach his or her verdict with an affidavit. State v. Hessler (2000), 90 Ohio St.3d 108, 123.
Because of the substantial evidence establishing defendant's guilt, any error caused by the subject letter did not prejudicially affect defendant's substantial rights. The medical experts consistently testified that Hayden displayed classic symptoms of shaken baby syndrome: large retinal hemorrhages in both eyes, a subdural hematoma with interhemispheric bleeding, and no visible signs of injury other than the large spot of soft swelling on his skull. The prosecution presented unrebutted medical testimony that Hayden was injured as the result of an inflicted head injury in the nature of a forceful impact to his head that had a rotational component to it, and that the injury could be caused by a hard hit, a kick to Hayden's head, or slamming him against a hard surface. Drs. Johnson and Gilles dismissed the possibility that the injuries in this case could have been caused by an accident. Defendant's expert, Dr. Plioplys, agreed with Dr. Johnson's evaluation of Hayden's case. Moreover, the evidence revealed Hayden first began displaying the symptoms consistent with his injuries while he was under defendant's sole care, and medical expert testimony indicated symptoms would be manifested immediately on infliction of the injury. Lastly, the lack of prejudice again is demonstrated in the jury's ability to sort through the evidence, as reflected in the disparate results arising from Hayden's and Joshua's injuries. Accordingly, defendant's fourth assignment of error is overruled.
Defendant's fifth assignment of error contends defendant was denied effective assistance of counsel due to counsel's failure to object to the admissibility of the letter noted above, or his failure to redact the prejudicial contents of that letter.
To prevail on her claim of ineffective assistance of trial counsel, defendant must show that "counsel's performance fell below [an] objective standard of reasonableness and that prejudice arose from counsel's performance." State v. Reynolds (1998), 80 Ohio St.3d 670, 674, citing Strickland v. Washington (1984), 466 U.S. 668. A two-prong test is used to examine claims of ineffective assistance of counsel. To meet Strickland's first prong, defendant must show counsel's conduct was objectively deficient, producing evidence that counsel acted unreasonably. State v. Sallie (1998), 81 Ohio St.3d 673, 674. To meet Strickland's second prong, defendant must prove that, but for counsel's errors, a reasonable probability exists that the result of the trial would have been different. Id.
Defendant's assignment of error claiming ineffective assistance of counsel is without merit. Although defense counsel was objectively deficient in failing to object to the admission of the letter, defendant has not shown the requisite prejudice. More particularly, because of the substantial medical evidence noted above, defendant has not demonstrated that but for the submission of the inadmissible character evidence to the jury for its consideration, a reasonable probability exists that the result of the trial would have been different. Id. Accordingly, defendant's fifth assignment of error is overruled.
Defendant's sixth assignment of error contends the trial court abused its discretion in allowing the prosecution to present Dr. James Yates as an expert witness to testify on behalf of the state because the prosecution failed to comply with the disclosure requirements of Crim.R. 16(B)(1)(e) and (D) regarding its intention to call Dr. Yates as a witness.
The record reflects that on Friday, November 3, 2000, the prosecution learned for the first time that Dr. Yates, a neuropatholigist, had examined Joshua's eyes after Joshua's death, and had written a report of his findings. On that same day, the prosecution obtained a copy of Dr. Yates' report and notified defense counsel regarding Dr. Yates' involvement in the case. According to the record, Dr. Yates left town on that Friday and was unavailable for either party to interview until Thursday, November 9, 2000. On Monday morning, November 6, 2000, the prosecution furnished defense counsel with a copy of Dr. Yates' report. Defense counsel moved that day to preclude Dr. Yates from testifying. At a hearing held on defendant's motion, the trial court stated that it ascribed no bad motives to the prosecution, and it denied defendant's motion to preclude Dr. Yates from testifying at trial. The trial court, however, ruled that Dr. Yates be made available for the defense to interview prior to Dr. Yates being called to testify at trial.
Pursuant to Crim.R. 16(B)(1)(e) and (D), the prosecution has a continuing duty to furnish to a defendant a written list of the names and addresses of all witnesses whom the prosecutor intends to call at trial, even if the existence of such a witness is discovered during trial. To prevail on her claim here, defendant must demonstrate that the trial court abused its discretion in allowing Dr. Yates to testify. State v. Scudder (1994), 71 Ohio St.3d 263, 268-269, certiorari denied (1995),515 U.S. 1164. See, also, State v. Barton (1991), 71 Ohio App.3d 455,469, certiorari denied (1992), 502 U.S. 1109. A trial court does not abuse its discretion in allowing a witness to testify where the record fails to indicate "(1) a willful violation of the rule, (2) that foreknowledge would have benefited the accused in the preparation of his or her defense, or (3) that the accused was unfairly prejudiced." Scudder, at 269.
Defendant has not demonstrated the trial court abused its discretion in allowing Dr. Yates to testify. Initially, the record does not indicate the prosecution willfully violated Crim.R. 16. Rather, the record suggests the prosecution promptly notified the defense of Dr. Yates' involvement in the case when the prosecution acquired the information. Next, defendant makes no substantive argument that foreknowledge would have aided her in the preparation of her defense. In that regard, defense counsel was afforded an opportunity to interview Dr. Yates prior to Dr. Yates' testifying at trial. Finally, defendant has failed to demonstrate she was unfairly prejudiced by the admission of Dr. Yates' testimony, as Dr. Yates testified about the injuries to Joshua, not the injures to Hayden. Defendant's sixth assignment of error is overruled.
Having overruled all of defendant's assigned errors, we affirm the judgment of the trial court.
TYACK and KENNEDY, JJ., concur.