THE STATE OF OHIO, APPELLEE, *v.* DAVIS, APPELLANT. ▌

[Cite as State v. Davis (1975), 44 Ohio App. 2d 335.]

(No. 32895—Decided March 20, 1975.)

*Mr. John T. Corrigan*, for appellee.
*Mr. Reuben M. Payne* and *Mr. Gerald S. Gold*, for appellant.

KRENZLER, C. J. This is an appeal by the defendant appellant, James Davis, from a conviction in the Common Pleas Court of Cuyahoga County for the first degree murder, in violation of R. C. 2901.01, of one Ellen Dawes, who was killed after having been shot in the head three times. Her husband, Charles Dawes, defendant appellant, James Davis, Billy Gene Carnes and Annabell Thompson were all indicted for the murder of Ellen Dawes. Charles Dawes was tried and found guilty of murder in the first degree. Attorney H. Donald Zimmerman was appointed to represent James Davis, Billy Gene Carnes, and Annabell Thompson.

The case of James Davis came on for trial on February 27, 1973 and a jury was impaneled and sworn. The prose-

cutor informed Mr. Zimmerman that the State intended to call Billy Gene Carnes as a witness. Mr. Zimmerman determined that he would be faced with a conflict of interest in representing the appellant because he would have to cross examine Billy Gene Carnes, whom he also represented. He therefore voluntarily withdrew from the appellant's case and also withdrew as assigned counsel from the cases of the other defendants, Billy Gene Carnes and Annabell Thompson. Thereafter, co-counsel, Richard Eisenberg, also requested and was granted permission to withdraw from appellant's case. The trial court then declared a mistrial.

The case again came on for trial on May 30, 1973. The State presented seven witnesses: Dr. Lester Adelson, Deputy Coroner, Billy Gene Carnes, Phillip Thornton, Barbara Jane Huggins, Charles Dawes, Kenneth Schlachd and Marjorie Jackson.

In summary, the State's evidence was that one Ellen Dawes was killed in the City of Parma Heights on July 20, 1972, after having been shot in the head three times. Her husband, Charles Dawes, and one Billy Gene Carnes were frequenters of Vi's Bar on Prospect Avenue in the City of Cleveland, and in February of 1972 they became personally acquainted when Dawes offered Carnes $500 to kill Dawes' wife. Carnes told this to his friend Mike Vandergriff, who stated that Dawes also offered him $500 to kill his wife.

Between February and July of 1972, Carnes borrowed money from Dawes on two occasions. Each time he did so he was driven to a place near Dawes' home. On the second occasion he was driven to the place by his friend James Davis, the appellant, whom he introduced to Dawes. Carnes advised Davis that Dawes wanted him (Carnes) to kill his wife.

On July 18, 1972, Dawes met Davis and a woman at the Southland Shopping Center, Dawes denying that the meeting was prearranged. Davis was in a 1967 dark blue Pontiac with the woman and they had a child with them.

On or about July 19 or 20th, James Davis saw Carnes and advised him that Dawes was becoming desperate and

that he had raised the offer to kill his wife from $500 to $2000 and Davis wanted to know if Carnes was going with him. When Carnes said that he would not participate, Davis used profanity and drove away. Carnes testified that Davis had a long-barreled .22 caliber hand gun.

On the evening of July 20, at approximately 11:00 P. M., Dawes was home alone when Davis and the woman who was with him at the shopping center on July 18 came to Dawes' house. Davis said that they were going to tie Dawes up in the basement and rob him. When Mrs. Dawes came home and observed the situation, she became hysterical and began screaming. Davis put a gun to her head and together with the woman took Mrs. Dawes into the fruit cellar. Dawes testified that he heard three shots. Davis and the woman then left but not before warning Dawes that he had better not say anything about the incident. Dawes freed himself and called the police. He gave the police a statement in which he told them that four young men came into the house and committed the crime. He later changed his story in a second statement. He then came into court in this case and testified against Davis, stating that his reason for the inconsistent prior statements was that he was afraid of Davis because of Davis' threats against him. He also testified that the reason he became a witness was that he couldn't go on living knowing that Davis had killed his wife and yet might go unpunished. Dawes denied that he ever offered to pay Carnes, Davis or Mike Vandergriff any money to kill his wife. At the conclusion of his testimony, Dawes positively identified Davis as the man who killed his wife.

Following the murder, Carnes read about it in the newspaper then called the police and told them that if they wanted to know about the killing, they should go to 3650 Prospect Avenue and see either Prospect Slim or Big Mike.

Kenneth Schlachd, a police officer in Parma Heights, testified that at 11:50 P. M. on July 20, 1972 he was notified of the robbery. He testified that Dawes made two statements to the police with two different stories. He further stated that based on information from Mike Vandergriff the

police put out a radio call for James Davis and a woman. Subsequently Davis turned himself in.

Phillip Thornton of Dayton, Ohio, testified that on July 23 or 24, 1972, Annabell Thompson, his first cousin, and Davis came to Dayton where Annabell told Thornton she was in big trouble and asked if he wanted to buy a gun. He stated that when he said no, they left. He testified that they were in an old model blue-green Pontiac.

Barbara Jane Huggins, sister of Annabell Thompson, testified that her sister lived with James Davis. On July 29, 1972 she met her sister and Davis; both of them told her that they were being framed for murder and that they wanted help in getting out of town. They said they wanted to be taken to Detroit. Barbara Jane testified that her husband and son helped them.

Marjorie Jackson testified that she was a friend of James Davis and that James Davis and Annabell and Annabell's small son came to her house in the Pontiac on the afternoon of July 18, 1972. Marjorie said that Annabell came into the house to borrow money, which she lent her.

In addition, on direct examination of State's witness, Marjorie Jackson, the following dialogue took place, which relates to the third assignment of error to be hereinafter discussed.

"Q. And would you have conversations with Mr. Davis at that time?

"A. Yes, I would.

"Q. And did Mr. Davis tell you what he did?

"A. Yes, he did.

"Q. And can you tell us what he told you?

"Mr. Gold: Objection.

"The Court: Give us the time, and then she can tell us. When approximately was this?

"The Witness: This, well, it was after Easter.

"The Court: Easter of '72?

"The Witness: Yes.

"The Court: What did he tell you?

"The Witness: He told me that he was a contractor.

"Q. He told you that he was a contractor. Did he say anything further about that term to you?

"Mr. Gold: Objection.

"The Court: Overruled.

"A. Yes, I asked him just exactly what it meant.

"Q. And what did he tell you?

"A. Told me to eliminate people. [sic]

"Q. Told you that he eliminates people?

"A. Yes.

"Q. And did you have any further discussions about this with him?

"A. I asked him why he did it. Did he have a conscience.

"Mr. Payne: I am sorry.

"The Court: Asked him why he did it. Did he have a conscience. Is that what you said?

"The Witness: Yes.

"Mr. Gold: Objection. Would you read that back, please? (Whereupon, the reporter read back the last answer.)

"Mr. Gold: Objection.

"The Court: Overruled.

"Q. And what was his answer to the question, did he have a conscience?

"A. He said he—

"The Court: Little louder, please.

"A. He said he killed so many he doesn't really feel it, you know."

Defense counsel objected to this testimony on the ground that it was an attack on the appellant's character. Eventually, the court agreed that it was improper and instructed the jury to disregard the foregoing statements with respect to the occupation of the appellant. The court told the jury that they were to determine whether or not the appellant was guilty or innocent of the charges made in the trial and that they were to confine themselves to those issues and those issues alone.

At the conclusion of the trial, the jury returned a verdict of guilty of murder in the first degree. The defendant

appellant has taken this appeal and presents three assignments of error.

1. Where the declaration of a mistrial is based upon a foreseeable circumstance which lends itself to "prosecutorial manipulation," the double jeopardy clause of the fifth amendment bars further prosecution for an offense.

2. In the absence of "manifest necessity" or the consent of the defendant, the declaration of a mistrial and the discharge of the jury is a bar to further prosecution for an offense.

3. The introduction of evidence concerning alleged boasts by the appellant that he had committed previous crimes is prohibited and the introduction of such evidence over objection is prejudicial error, where the alleged previous crimes are "wholly independent of the offense for which he is on trial," and irrelevant to the issues at bar.

Because assignments of error one and two are concerned with the declaration of a mistrial in the first trial of this case and its possible relationship to the double jeopardy clause of the fifth amendment to the United States Constitution, we will consider them together.

The appellant, in essence, argues in his first two assignments that the second prosecution conducted subsequent to the declaration of a mistrial in his first trial on February 28, 1973 violated the double jeopardy clause of the fifth amendment. We conclude that assignments of error one and two are not well taken.

The United States Supreme Court directed its attention to the subject of mistrials in the case of *Illinois* v. *Somerville* (1973), 410 U. S. 458. The Court there declared that a trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of guilty could be reached, but would have to be reversed on appeal due to an obvious procedural error at trial. The Court stated that in these two instances it would not serve "the ends of public justice" to require the government to proceed with a trial. The Court further declared that when a situation exists where a trial court, exercising its reasonable discretion, concludes that the aforementioned

342

"ends of public justice" would be defeated by allowing the trial to continue, it may declare a mistrial based on "manifest necessity" and another trial of the defendant will not be barred by the double jeopardy clause of the fifth amendment.

However, the Supreme Court has also held that there are other situations where the declaration of a mistrial would lead to a bar against further prosecutions of a defendant. Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are two examples of situations where jeopardy attaches and the double jeopardy clause bars subsequent retrial. See *Downum* v. *United States* (1963), 372 U. S. 734. The declaration of a mistrial on the basis of a rule or a defective procedure that would lend itself to "prosecutorial manipulation" would bar a succeeding prosecution. *Illinois* v. *Somerville, supra.*

We have reviewed the record and the facts surrounding the declaration of the mistrial in this case and we conclude that at no time was there any evidence of "prosecutorial manipulation." The State informed the court that it intended to call Billy Gene Carnes, another defendant, as one of its witnesses. The State had previously planned to call Charles Dawes, who had been convicted earlier for his part in this murder as a witness, but he had decided to exercise his fifth amendment privilege.[1]

After realizing the conflict of interest that the State's calling of Billy Gene Carnes would present, both Mr. Zimmerman and Mr. Eisenberg requested permission to withdraw from the case. They felt that they could not properly defend the appellant, Mr. Davis, while attempting to cross-examine another client. At no time did the State of Ohio request a mistrial. In fact, it was Mr. Zimmerman who requested that the court consider declaring a mistrial. The court explained the situation to the appellant and he stated

---

[1]At the second trial of this case, commencing on May 30, 1973, Dawes changed his mind and did testify against Davis.

that he understood. At no time did the appellant voice any objections to the procedure.

We conclude that had the first trial proceeded under the circumstances as they existed before the withdrawal of counsel and had a guilty verdict been reached, a reversal would have been required. The conflict of interest presented at the first trial would have seen counsel defending both the appellant and the State's witness, Billy Gene Carnes. This conflict of interest would have mandated a reversal of any judgment of conviction.

We further conclude that the "ends of public justice" referred to in *Illinois* v. *Somerville, supra,* were met by the trial court's action and that there was a "manifest necessity" to declare a mistrial under the circumstances. The double jeopardy clause of the fifth amendment did not bar a retrial of the appellant in this case.

The third assignment of error deals with the aforementioned testimony of Marjorie Jackson concerning the appellant's occupation as a contract killer and whether allowing the jury to hear this testimony was prejudicial to the appellant.

Generally, in a criminal case, where there is an appeal by a defendant from a conviction, and an assignment of error that the guilty verdict is against the manifest weight of the evidence, the reviewing court must merely determine if there was sufficient evidence as to each and every element of the crime from which a jury of reasonable persons could find the defendant guilty beyond a reasonable doubt. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230.

In contrast to the above, in a case in which the appellant alleges that it was prejudicial error to allow the jury to hear certain testimony, the reviewing court must first determine if it was error to allow the jury to hear this testimony, and if so, whether such error was prejudicial or harmless. In so determining the latter point, a reviewing court must employ a test different from the one enunciated above. The court must read the entire record, disregarding the objectionable material, and then determine whether or not there was overwhelming evidence of the appellant's

344

guilt.   *Harrington* v. *California* (1969), 395 U. S. 250; *Chapman* v. *California* (1967), 386 U. S. 18.[2]

If the error alleged is constitutional in nature, and if the court finds that there is overwhelming evidence of the appellant's guilt, disregarding the disputed material, then it must hold that the error is not prejudicial but harmless error beyond a reasonable doubt.   If the court so finds, then it must affirm the judgment of the trial court.   However, if the reviewing court cannot say that there was overwhelming evidence, disregarding the controverted material, then the error is prejudicial and not harmless error, and the court must reverse the judgment of the trial court.

In the case before us, we must first determine whether it was error to allow the jury to hear the testimony regarding the defendant appellant's occupation, and if it was error, whether the trial court's admonition to the jury to disregard this testimony cured the error.   Further, if the admonition of the trial court did not cure the error, we must determine whether such error was "harmless error" or "prejudicial error."

We hold that it was error to allow the jury to hear, over defense objection, Marjorie Jackson's testimony concerning the appellant's occupation as a hired killer.   It was error for four distinct reasons.   Firstly, this whole line of questioning constituted, in effect, an attack on the appellant's character.   Such an attack was impermissible because the appellant had not placed his character in issue.   Secondly, the testimony was irrelevant.   Testimony as to boasts made by the defendant to third persons of having committed other offenses which have no connection with and form no part of the affair in which the deceased was killed is not, over objection, admissible in evidence.   *State* v. *Strong* (1963), 119 Ohio App. 31.   Further, in Ohio, evidence which tends to

---

[2]The *Chapman-Harrington* test, which requires "overwhelming evidence" of the appellant's guilt, is employed when federal constitutional error is involved.   Another test, under Ohio law, which requires "substantial evidence" of the appellant's guilt, is employed when non-constitutional error is involved.   These two tests will be discussed in depth later in this opinion.

show that a defendant has committed a crime which is "wholly independent" of the alleged crime for which he is on trial, is inadmissible and the introduction of such evidence over the defendant's objection is error. *State* v. *Hector* (1969), 19 Ohio St. 2d 167. Thirdly, the testimony to the effect that the appellant was a hired killer was of such an inflammatory nature as to require exclusion on that basis alone. Finally, the testimony was not admissible under R. C. 2945.59, the similar acts statute, because it was not evidence of specific acts committed at points near in time to the crime in question, and further there was no limiting instruction on similar acts given by the trial court.

We further hold that the trial court's admonition to the jury to disregard this testimony did not cure the error. In some criminal cases, an instruction such as that given by the trial court here would have cured the error, but where the objectionable matter is so inflammatory, as is the material in this case, a jury instruction to disregard the testimony is not sufficient. *Bruton* v. *United States* (1968), 391 U. S. 123.

Having determined that the testimony in question was error, and that the instruction by the trial court did not cure such error, we come then to the question of whether the error was "harmless" or "prejudicial." We have carefully studied the whole record, disregarding the material that the appellant alleged was prejudicial, and we conclude that the record demonstrates overwhelming evidence of the appellant's guilt aside from the disputed evidence. We therefore hold that the error in allowing the jury to hear testimony concerning the appellant's occupation as a contract killer was harmless error beyond a reasonable doubt.

We do not reach this conclusion without some difficulty. Appeals such as the present one charging error in allowing the jury to hear inflammatory material put reviewing courts in a difficult position. Defense lawyers, on the one hand, find it hard to understand how admittedly inflammatory and otherwise erroneous evidence can be allowed into the trial of a criminal case without violating the accused's right to

a fair trial. They believe that the jury's hearing of such evidence requires a reversal in every case. Prosecutors, on the other hand, find it hard to understand how, even though there is overwhelming evidence of guilt based on other testimony, an accused can complain of the prejudicial effect of one small bit of evidence that gets into the record. We as a reviewing court are aware of the conflict in views between the two groups; it is our duty to resolve that conflict by a careful weighing and balancing of the merits found in both viewpoints.

In dealing with the problem, a discussion of the background of the harmless error rule is in order. Initially, harmless error in the trial of a criminal case must be broken down into one of two categories, either harmless constitutional error or harmless non-constitutional error.

The rule pertaining to harmless constitutional error was promulgated by the United States Supreme Court in the cases of *Harrington* v. *California, supra,* and *Chapman* v. *California, supra.* In *Chapman,* the Supreme Court held that before a federal constitutional error in the trial of a criminal case can be held harmless, the reviewing court must be able to conclude that it was harmless beyond a reasonable doubt, or stated differently, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. In *Harrington,* which was decided two years later, the Court extended the concept of what constituted harmless error beyond the definition in *Chapman* by holding that where evidence supplied in violation of a constitutional right was merely cumulative, and the other evidence against the accused was overwhelming, that the reviewing court could conclude beyond a reasonable doubt that the denial of the accused's constitutional rights was harmless error.

On the other hand, Ohio law dictates the rule pertaining to harmless non-constitutional error. When errors are asserted in a criminal trial that do not relate to a violation of any of the accused's federal consitutional rights, Ohio Rule of Criminal Procedure 52(A) provides the governing general principle. Rule 52(A) states:

"Any error, defect, irregularity, or variance which

does not affect substantial rights shall be disregarded.''

However, because Rule 52(A) speaks only in broad terms, we must look to other rules of criminal procedure and to Ohio case law to determine the specific standard to be used in a particular instance in deciding if substantial rights have been affected. Since this case pertains to the specific error of allowing the jury to hear inflammatory and otherwise erroneous evidence, we look to Rule 33 of the Ohio Rules of Criminal Procedure and to case law interpreting its predecessor statute, R. C. 2945.83.

Rule 33 deals with new trials; 33(E)(3) provides:

''No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of: (3) the admission . . . of any evidence offered against . . . the defendant, *unless, the defendant was or may have been prejudiced thereby;*'' (Emphasis supplied.)

Rule 33(E)(3)'s predecessor, R. C. 2945.83(C), employed substantially the same language.[3] Both the statute and the newer rule contain the key phrase ''unless the defendant was or may have been prejudiced thereby.'''[4] In *State* v. *Cowans* (1967), 10 Ohio St. 2d 96, at 104, the Ohio Supreme Court interpreted that crucial phrase to mean that the prejudice referred to cannot be shown where ''there is substantial evidence to support the guilty verdict even after the tainted evidence is cast aside.''

The Ohio test then for determining whether the admission of inflammatory and otherwise erroneous evidence is harmless non-constitutional error requires the reviewing court to look at the whole record, leaving out the disputed evidence, and then to decide whether there is other substantial evidence to support the guilty verdict. If there is substantial evidence, the conviction should be affirmed, but if there is not other substantial evidence, then the error is not harmless and a reversal is mandated.

This test is similar to the one propounded for harmless

---

[3]R. C. 2945.83(C) contained the additional phrase ''. . . unless it affirmatively appears on the record. . . .'' The omission of that phrase in Rule 33(E)(3) does not affect this appeal.

[4]R. C. 2945.83(C) used the word ''accused'' rather than ''defendant.''

constitutional error in *Chapman* and *Harrington, supra.* However, under the Ohio test the burden is on the accused to show that he "was or may have been prejudiced thereby" while under the constitutional test the burden is on the prosecution to show beyond a reasonable doubt that the error was harmless.[5] The Ohio test requires "substantial" evidence[6] exclusive of the tainted material to find the error harmless while the constitutional test requires "overwhelming" evidence[7] exclusive of the tainted material to find the error harmless beyond a reasonable doubt. The constitutional test provides a more exacting standard presumably because the accused has suffered a violation of his constitutionally-protected rights.

We recognize that many courts do not make the fine distinction between harmless constitutional error and harmless non-constitutional error but that they apply the *Chapman-Harrington* standard regardless of the type of error involved. We also realize that the injection of the inflammatory and otherwise erroneous material in this case could be a violation of the appellant's right to a fair trial as that term is understood under the due process clause of the fourteenth amendment. This constitutional approach would require the application of the more rigorous federal standard. We hold that the error was harmless under either standard.

Because of the harmless error rule as spelled out under either test, we must look at the record as a whole. We are not permitted to merely isolate the erroneous evidence, find it inflammatory, and then automatically order a new trial. We must view this material in light of the entire record, keeping in mind that there usually is error of some sort in every case, and that while an accused is entitled to a fair trial that no conviction could ever be sustained if each irregularity was recognized as a basis for reversal. *State v. Dickerson* (1907), 77 Ohio St. 34, at 48.

[5]See the Author's Text following Rule 52 of the Ohio Rules of Criminal Procedure in Schroeder—Katz, *Ohio Criminal Law and Practice*, Volume Two, p. 291.

[6]*State* v. *Cowans* (1967), 10 Ohio St. 2d 96, at 104.

[7]*Harrington* v. *California* (1969), 395 U. S. 250.

The nature of disputed evidence becomes a crucial factor under the harmless error rule only in a close case. When evidence of an accused's guilt is overwhelming, apart from the disputed evidence, then the erroneous material did not interfere with the accused's right to a fair trial. The reviewing court may find that although inflammatory and otherwise erroneous material was heard by the jury, that nevertheless it was only cumulative evidence not necessary to prove the defendant's guilt, and that therefore the fact that it was heard was harmless error. But, conversely when the evidence of an accused's guilt is either weak or such as to present a close case, then it is clear that the wrongly heard material did interfere with the accused's right to a fair trial. Under these circumstances, the reviewing court cannot find the error harmless but must find it prejudicial and must reverse and order a new trial.

The operation of the harmless error rule lends itself to abuse. A minority of prosecutors are overzealous and feel that the stronger their case is the more chances they can take with regard to injecting inflammatory and otherwise erroneous material into the record to insure a conviction. We strongly *admonish* those prosecutors who intentionally inject such material into a criminal case to refrain from doing so in the future for the following reasons.

Firstly, any error in a case should be inadvertent, not deliberate. This discussion is directed to overt intentional actions by the State in introducing inflammatory and erroneous material and does not refer to accidental, unintentional introduction of such material. A criminal prosecution should be decided on competent, relevant, admissible evidence only. Secondly, both the prosecution and the defense have a professional duty to refrain from overtly putting into evidence matter that is erroneous and inflammatory as the evidence in this case clearly was. Thirdly, it is not right or fair to an accused to attempt to convict him on evidence that serves no other purpose than to inflame the passion and prejudice of the jury. Fourthly, it is not a sound trial tactic to gamble on the substantial or overwhelming nature of one's case. An overzealous prosecutor may feel a case is strong in his own mind only to find that

the evidence is not so viewed by the reviewing court. In short, such a prosecutor may miscalculate. Fifthly, in a strong case, where the evidence is overwhelming, the prosecutor does not need this kind of material to secure a conviction, and in a weak or borderline case, where the evidence is not overwhelming, the injection of such matter will lead to a reversal and new trial. Finally, the jury's hearing of inflammatory and otherwise erroneous material serves no useful purpose. It merely creates difficulties for the trial court, causes further problems for the appellate court on review, burdens the docket with needless appeals, many of which turn into reversals and new trials, and slows down the functioning of the entire judicial process, with the increased burden caused by the slowdown falling upon the taxpayers.

In this case, the prosecutor was fortunate. He did in fact have a strong case  Other overzealous prosecutors in the future may not enjoy such good fortune.

Further, the trial courts are also reminded that when they become aware that inflammatory, erroneous and prejudicial evidence is about to be introduced, or when prosecutors or defense attorneys begin to make inflammatory, erroneous and prejudicial statements, the courts have a duty to make every effort to prevent such material from being heard by the jury.

In conclusion, we will state again that we have read the entire record and conclude that, excluding the erroneous testimony of Marjorie Jackson, the balance of the evidence constituted overwhelming evidence of the appellant's guilt. The error here was harmless error beyond a reasonable doubt.

*Judgment affirmed.*

JACKSON and DAY, JJ., concur.

DAY, J., concurring. In general, I agree with the views expressed by the majority. However, I add a few words to clarify what seems to me to be the applicable law. An error may be prejudicial and harmful in a close case, see

*Hoare* v. *Cleveland* (1933), 126 Ohio St. 625, 628-629, but loses its prejudicial and harmful quality when the evidence of guilt is overwhelming. Nonetheless, there are circumstances such as the lack of counsel (see Justice Stewart's concurrence in *Chapman* v. *California* (1967), 386 U. S. 18, 42-43, 17 L. Ed. 2d 705, 720-721) in which the law does not pause to determine prejudice or lack of it on the basis of the weight of the evidence. Such conditions lack essential elements of fairness and are short of Due Process per se beyond a reasonable doubt whether the proof of guilt is close, or short, or long. In such cases the Constitution requires a new trial without an evaluation of effects.