OPINION.
Appellant Daniel J. Campbell was charged with the attempted murder of Stacy Porter and with two counts of aggravated arson. The first aggravated-arson count alleged that Campbell had knowingly created a substantial risk of physical harm to Porter by means of fire. The second count alleged that he had knowingly caused serious physical harm to an occupied structure by means of fire. A jury acquitted him of the attempted-murder charge but found him guilty of the aggravated-arson charges. The trial court sentenced Campbell to consecutive terms of confinement, one for ten years and the other for eight years.
 I. Campbell's Appeal
Campbell appeals his conviction, raising three assignments of error. In his first assignment, he claims that the trial court erred by overruling his objection to an expert's opinion on the cause of the fire. Campbell challenges the imposition of consecutive sentences in his second assignment. In his last assignment, Campbell challenges the weight and the sufficiency of the evidence supporting his conviction.
 II. Porter's and Campbell's Accounts of the Fire
Porter initially testified that while she slept, Campbell, her some-time boyfriend, poured lighter fluid on her. She awoke and took a bath to remove the liquid. After her bath, she put on her shirt and jeans and returned to bed. She awoke when she smelled her flesh burning. She attempted to extinguish the fire and passed out. But she also testified that Campbell poured lighter fluid on her and that she started to burn, without discussing the intervening bath. She denied drinking alcoholic beverages that evening.
According to Cincinnati fire investigators and firemen, Campbell provided several versions of what had occurred. In one version, he claimed that he and Porter had been mixing chemicals when the chemicals unexpectedly burst into flames and injured Porter. In his other versions, Campbell had left Porter, shirtless, sitting on the couch in the living room of his locked third-floor apartment, smoking a cigarette, while he sought either food or marijuana. After five to fifteen minutes, Campbell returned and saw the apartment on fire. He ran up the stairs and found Porter lying by the door near the couch. He carried her from the apartment, while breathing in her mouth and praying that she would survive. On the second-floor landing, a fireman took Porter from him and carried her out of the building. In these latter accounts, Campbell believed that the fire had begun when Porter dropped the cigarette she had been smoking.
The fireman who first saw Porter and Campbell stated that Porter was lying on her side in the back corner of the second-floor landing with Campbell hunched over her. Campbell told the fireman that Porter was breathing. At the fireman's request, Campbell pushed Porter into the fireman's arms and the fireman carried her outside. Porter was wearing pants only and was severely burned from her waist up.
 A. The Testimony of the Fire Investigators
Lieutenant Dan Wolf and Jay Dold of the Cincinnati Fire Investigation Unit investigated the cause of the fire. Wolf arrived at the apartment while the fire was being extinguished. He first looked for a fire pattern, working from the least damaged area of the apartment to the most damaged area. Because the area with the most damage was on the right side of the couch in the living room, Wolf believed that this was the origin of the fire.
Wolf did not believe that a dropped cigarette started the fire, because the fire was not a smoldering fire. He based this determination on the fact that Campbell had said he had been away from the apartment for only a short time before the fire occurred. He determined that the fire was not an electrical fire, because the multiple-plug outlet had not melted. Wolf believed that the burn pattern indicated that the fire was an open-flame fire started by something similar to a match or a candle.
Because she was intubated for treatment and unable to speak, Wolf did not speak to Porter until three weeks later. Dold interviewed Campbell immediately after the fire. Porter later told Wolf that Campbell had set her on fire with lighter fluid.
Dold began his investigation at the hospital where Porter had been transported. He talked to two firemen who were there and took photographs of Porter's injuries. He also spoke with Campbell, who was at the hospital. Campbell told him that he and Porter had been drinking before they returned to his apartment. According to Campbell, he had left the apartment for five to ten minutes to get food. When he returned, he unlocked his apartment door and found Porter lying by the door. He took her to the second-floor landing, where a fireperson took her outside.
The fire investigators arrested Campbell after the interview and after he had failed to appear at his appointments with them. Campbell then gave Dold another statement in which he claimed that Porter had removed her shirt before she asked him to get food. He said that he was gone no more than fifteen minutes. In yet another statement, he said that he had left the apartment to buy marijuana.
Based on the evidence at the scene and the interviews with Porter and Campbell, Wolf opined that the fire had occurred when Campbell poured lighter fluid on Porter and set her on fire, which, in turn, set the couch on fire.
On cross-examination, Wolf testified that he had found no lighter fluid in the apartment. He also concluded that the fire had not started in the bed, but that the bed was charred and bedding material was burned when the fire flashed.
 B. Physician's Testimony
Although Dr. Richard Kagan testified that Porter's burns were "consistent" with a flame-type burn, he could not determine whether an accelerant had been used. He testified that it was easy to ignite clothing sullied by an accelerant and that the odor of an accelerant on clothing was a clear indicator of its involvement in the burning of a victim. But the lack of an odor, according to Dr. Kagan, could not eliminate its involvement because the victim's clothing frequently was removed before the doctor saw the victim. Dr. Kagan testified that Porter's toxicology reports indicated that she had amphetamines in her system and that she had a blood-alcohol concentration of .269. Dr. Kagan described Porter as having acute alcohol intoxication on the night of the fire.
 C. Campbell's Evidence
Campbell put on evidence that Porter would become intoxicated and fall asleep with a lit cigarette in her hand, that she had burned herself previously when refilling a cigarette lighter, and that she had been inebriated on the night of the fire. He also offered the testimony of Michael Trimpe, a criminalist employed by the Hamilton County Coroner's Office.
Trimpe testified that he specialized in arson analysis. He had tested the jeans Porter wore on the night of the fire to determine the presence of an accelerant. The vapor test he conducted failed to show the presence of an accelerant. On cross-examination, Trimpe testified that because the jeans had not been properly sealed in a timely manner, any accelerant would have evaporated by the time of the testing.
There was no evidence of an accelerant at the apartment. There was no odor of an accelerant on Porter's body. There was evidence that it was rare that the odor of an accelerant would be noted at the scene of a fire.
 III. Expert Testimony Was Improperly Admitted
In his first assignment, Campbell argues that it was error for the trial court to allow Wolf to testify that the cause of the fire was Campbell pouring lighter fluid on Porter and setting her on fire. Campbell claims that, because the opinion was based on hearsay and was unsupported by the physical evidence, there was no foundational basis for Wolf's opinion in violation of Evid.R. 702(C).
At trial, Campbell had moved for a mistrial, arguing that Wolf's information that Campbell had put lighter fluid on Porter was not information he personally had at the time, but was based on hearsay.
 A. Evidence Rules 702 and 704
Admissibility of expert opinion testimony is specifically governed by Evid.R. 702 and 704 and, more generally, by Evid.R. 402 and 403. Evid R. 702 requires that (1) the witness's testimony relate to matters beyond the knowledge or experience of a layperson; (2) the witness have specialized knowledge, skill, experience, training or education regarding the subject matter of his or her testimony; and (3) the witness's testimony be based on reliable scientific, technical, or specialized information. The fact that Wolf had specialized knowledge, experience, training and education to qualify him as an expert on fire origin and cause is not disputed. What is disputed is whether his opinion that Campbell had started the fire by putting lighter fluid on Porter and setting her on fire was based on reliable information.
The purpose of expert testimony is to "assist the trier of fact in determining a fact issue or understanding the evidence."[1] Evid.R. 702 "is rooted in the fact that the jury is unable to draw proper inferences from the facts in certain situations. An expert witness, however, is qualified to arrive at such conclusions by reason of his or her expertise in a particular field."[2] But, because it does not assist the trier of fact, "an expert witness `may not express an opinion upon matters as to which a jury is capable of forming a competent conclusion.'"[3]
Knowledge based on unreliable techniques or principles cannot, as a matter of law, assist the trier of fact to understand the evidence or to determine a fact in issue.[4] Whether an expert's opinion is admissible depends on whether the principles and methods employed by the witness to reach his opinion are reliable and not "whether his conclusions are correct."[5] It is "[r]elevant evidence based on valid principles" that satisfies "the threshold reliability standard for the admission of expert testimony under Evid.R. 702."[6] Thus, the witness's knowledge "must not be based on subjective belief or unsupported speculation."[7]
Evid.R 704, in conjunction with Evid.R. 702, 402, and 403, allows opinion testimony on an ultimate issue to be decided by the trier of fact. But a trial court may refuse to admit a qualified expert's testimony on the ultimate issue to be decided by the jury, if "such testimony is not essential to the jury's understanding of the issue and the jury is capable of coming to a conclusion without it."[8] Thus, in order not to infringe on the function of the jury, expert opinion as to an ultimate issue requires the "application of expert knowledge not within the common knowledge of the jury."[9] Because the competency of the jury to resolve the factual issue is what determines whether the opinion testimony is of assistance, "an ultimate issue opinion by an expert should be excluded "in the extreme case where the expert's opinion is inherently misleading or unfairly prejudicial.[10] Further, an opinion on the ultimate issue cannot be "essentially a bare conclusion significantly lacking in supporting rationale."[11]
Similarly, as explained by the Ohio Supreme Court, "In a more general sense, admissibility of expert testimony is governed by Evid.R. 402 and 403. Pursuant to Evid.R. 402, all relevant evidence is admissible, subject to enumerated exceptions* * *. Correspondingly, Evid.R. 403 provides for the exclusion of even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue influence or needless presentation of cumulative evidence."[12]
Obviously, if the expert's opinion testimony is irrelevant or its danger prejudicially outweighs its probative value, it will not assist the trier of fact and should not be admitted.
 B. The Expert Properly Testified as to the Origin of the Fire
Wolf testified that when he investigated a fire with an injury, he interviewed the victim and other witnesses to determine ignition sources. In this case, he left the cause of the fire undetermined until he spoke with Porter three weeks after the fire.
Based on the physical evidence found at the scene of the fire, Wolf testified that the burn pattern in the apartment looked like an open-flame fire that had been started by a match, a candle, or a similar item, and that it had originated on the right side of the living-room couch. Wolf did not see any burn patterns to indicate that a flammable liquid had been placed on the floor or on the couch. He failed to take a sample from the couch because the scene was such that it did not appear that an accelerant had been used. There was no lighter fluid or chemicals found in the apartment.
Wolf eliminated an electrical cause for the fire based on the appearance of the multiple-plug outlet. He eliminated a burning cigarette as a cause of the fire based on reports from others that Campbell had said that he had been away from the apartment for a short time before the fire started.
Based on all the facts Wolf had gathered, he believed that the cause of the fire was Campbell pouring lighter fluid on Porter and setting her on fire, and Porter then spreading the fire to the couch. He testified that his conclusion was consistent with his findings at the scene.
We are persuaded that Wolf qualified as an expert in fire cause and origin. To continue our analysis, we must distinguish between "origin" and "cause" of a fire. "`Origin' is the place where something starts. It is the source or beginning place. `Cause,' on the other hand, is a condition or happening that brings about a specific effect or produces a resultant condition. * * * Whether or not `origin' and `cause' require an expert opinion for their establishment depends upon the facts and circumstances of each case."[13]
We are persuaded that Wolf's testimony concerning origin of the fire was helpful to the jury, as was his testimony eliminating electricity as a cause of the fire. Obviously, the inferences and conclusions to be drawn from the pattern in which a fire burns are outside the experience and knowledge of the jury. In a similar vein, the determination of whether electricity is a cause of a fire is outside the jury's knowledge and experience. And the fact that a smoldering cigarette would take longer than five to fifteen minutes to create a fire similar to the instant one was also the proper subject of expert testimony. Thus, the jury was arguably assisted in hearing Wolf's testimony regarding the origin of the fire, and his testimony that the cause of the fire was an open flame was based on reliable information. The jury was also arguably assisted by hearing his opinion on what did not cause the fire based upon his observations at the scene.
 C. The Expert Improperly Testified as to the Cause of the Fire
When asked what had caused the fire, Wolf testified that it was caused by Campbell pouring lighter fluid on Porter and setting her on fire. The only basis in the record for his opinion was his interview with Porter. There was no physical evidence that linked Campbell to the fire. There was no physical evidence to demonstrate the use of lighter fluid. Wolf's opinion was based on his underlying belief that Porter was telling the truth when she made her statement to him. The state made no effort to show that Wolf was capable of reliably determining that Porter was telling the truth. He only testified that he interviewed victims and witnesses during his investigation of fires. Wolf's testimony that Campbell had caused the fire was based on his subjective appraisal of Porter's truthfulness and was admitted without an adequate foundational showing that the principles or techniques underlying his testimony on that issue were reliable.
Even if Wolf's opinion had qualified under Evid.R. 702(C), it would have been inadmissible under Evid.R. 704. The jury had before it all the necessary facts from which to ascertain the cause of the fire and could have determined the issue without hearing the opinion of Wolf. Wolf was no more qualified than the average juror to ascertain whether Porter's statement was truthful and consistent with the physical evidence about which he testified.[14] We have traditionally recognized that the credibility of witnesses is within the sole province of the trier of fact.[15] The effect of Wolf's testimony in this case was the same as directly opining on Porter's truthfulness. When the victim testifies at trial, an expert's opinion as to the victim's veracity is unnecessary because "this testimony becomes a subterfuge in the guise of proper expert testimony [that] this court cannot tolerate since it is the equivalent of allowing an expert to testify as to credibility."[16] An ordinary factfinder could have determined if Porter's charges were credible, and expert testimony would not have assisted under these circumstances. We agree with the Supreme Court of Iowa, which has stated, "Expert opinion testimony is admissible under * * * Rule of Evidence 702 if it `will help the trier of fact to understand the evidence or to determine a fact in issue.' The ultimate determination of the credibility or truthfulness of a witness is not a `fact in issue,' but a matter to be generally determined solely by the jury."[17]
Further, Wolf's opinion as to Porter's veracity was necessarily intertwined with Campbell's guilt or innocence. Wolf's opinion, in effect, stated that Campbell was guilty. Campbell's innocence or guilt was not an appropriate subject for opinion testimony.[18] Questions of guilt or innocence remain to be determined by the trier of fact alone based on the conclusions that it draws from the evidence.
Because Wolf's opinion testimony as to the cause of the fire failed to assist the jury, it was not relevant under Evid.R. 402 and had little probative value under Evid.R. 403. As discussed below, however, Wolf's conclusion that Campbell had started the fire by pouring lighter fluid on Porter and setting her on fire did have a prejudicial effect.
 D. The Improper Testimony Prejudiced Campbell
We must next determine whether admission of the improper evidence amounted to prejudicial error.[19] A nonconstitutional error in a criminal case is prejudicial if there is not other substantial nondisputed evidence to support the guilty verdict.[20] In fact, "when the evidence of an accused's guilt is either weak or such as to present a close case, then it is clear that the wrongly heard material did interfere with the accused's right to a fair trial. Under these circumstances, the reviewing court cannot find the error harmless but must find it prejudicial and must reverse and order a new trial."[21]
This case hinged on a determination of credibility. The physical evidence at the scene of the fire failed to indicate the use of any accelerant. The physical evidence supporting the origin of the fire was inconsistent with Porter's version of the events that Campbell had poured lighter fluid and set her on fire while she lay in the bed, but consistent with Campbell's version that Porter, while sitting on the couch, had carelessly dropped a burning cigarette. The physical evidence failed to corroborate Porter's version of the cause of the fire because there was no evidence of an accelerant in the apartment or on her body or clothing. It failed to support Campbell's version of the cause of the fire because of the short time between when Campbell stated he had left the apartment and when the apartment became engulfed in flames.
The jury's assessment of credibility was critical to this case. Wolf's opinion improperly bolstered Porter's testimony. In fact, he testified that the cause had been undetermined until he spoke with her. Thus, this case mainly turned on whether the jury believed Porter's story. Porter's version of the incident was one of many. It was related to Wolf weeks after the fire, by a witness who, at the time of the incident, had a blood alcohol level of .269, plus an undetermined level of amphetamine in her body. Because evidence of Campbell's guilt was weak, at best, and hinged solely on Porter's credibility, we conclude that Wolf's testimony interfered with Campbell's right to a fair trial. We sustain his first assignment.
 IV. Campbell's Conviction was Supported by Sufficient Evidence
Our disposition of Campbell's first assignment renders his second assignment concerning his sentence moot.[22] But, because Campbell cannot be retried if we sustain his challenge to the sufficiency of the evidence supporting his conviction, we must address his third assignment. To reverse a conviction for insufficient evidence, we must conclude that, when viewing the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have found Campbell guilty of aggravated arson.[23] Porter testified that Campbell had poured lighter fluid on her and set her on fire inside his apartment. Photographs depicted damage to the apartment. Photographs and other evidence demonstrated Porter's injuries. Neither the treating physician nor a Hamilton County criminalist could exclude the use of an accelerant in the setting of the fire based on either Porter's burns or the state of her clothing. Based on our review of the record, we conclude that there was sufficient evidence to find Campbell guilty of aggravated arson.
 V. Conclusion
Accordingly, because the trial court prejudicially erred when it allowed Wolf to testify that the cause of the fire was Campbell pouring lighter fluid on Porter and setting her on fire, we reverse the trial court's judgment and remand this case for a new trial consistent with this opinion and the law.
Judgment reversed and cause remanded.
Doan and Hildebrandt, JJ., concur.
[1] See Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607,611, 687 N.E.2d 735, 739-740.
[2] See State v. Davis (Dec. 31, 1998), Lake App. No. 97-L-246, unreported.
[3] See Rasalan v. TJX Operating Cos., Inc. (1998), 129 Ohio App.3d 364,369, 717 N.E.2d 1123, 1127.
[4] Accord Miller v. Bike Athletic Co. at 614, 687 N.E.2d at 741.
[5] See Miller v. Bike Athletic Co. at 611, 687 N.E.2d at 739.
[6] See State v. Hurst (Mar. 7, 2000), Franklin App. No. 98AP-1549, unreported, citing State v. Nemeth (1998), 82 Ohio St.3d 202, 210,694 N.E.2d 1332, 1338.
[7] See State v. Hurst, supra, citing Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 590, 113 S.Ct. 2786,2795
[8] See Bostic v. Connor (1988), 37 Ohio St.3d 144, 524 N.E.2d 881,882, paragraph two of the syllabus, construing Evid.R. 702 and 704.
[9] See McKay Machine Co. v. Rodman (1967), 11 Ohio St.2d 77,228 N.E.2d 304, paragraph three of the syllabus.
[10] Weissenberger's Ohio Evidence (2000), Section 704.3, at 345-346;State v. Haynes (Sept. 21, 1988), Lorain App. No. 4310, unreported.
[11] See Gannett v. Booher (1983), 12 Ohio App.3d 49, 53,465 N.E.2d 1326, 1332.
[12] See Schaffter v. Ward (1985), 17 Ohio St.3d 79, 80, 477 N.E.2d 1116,1117-1118.
[13] See Fidelity Guaranty Ins. Underwriters, Inc. v. Gary DouglasElectric, Inc. (1974), 48 Ohio App.2d 319, 322, 357 N.E.2d 388,391.
[14] See State v. Hollon (Jan. 28, 1991), Clermont App. No. CA90-03-029, unreported (expert testimony bolstered credibility of victim's testimony and did not aid trier of fact); State v. Harris (June 17, 1985), Clermont App. No. CA84-10-073, unreported (where jury heard victim testimony, expert substituted her opinion of victim's credibility for jury's assessment).
[15] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212,213, paragraph one of the syllabus.
[16] See State v. Hollon, supra.
[17] See State v. Myers (Iowa 1986), 382 N.W.2d 91, 97.
[18] See State v. McCoy (1973), 33 Ohio App.2d 261, 294 N.E.2d 242.
[19] See State v. Barton (1991), 71 Ohio App.3d 455, 469, 594 N.E.2d 702,712; Bartley v. Little (Dec. 28, 2000), Muskingum App. No. CT99-0016, unreported.
[20] See State v. Webb (1994), 70 Ohio St.3d 325, 334, 638 N.E.2d 1023,1032; State v. Mabrey (May 17, 1995), Hamilton App. No. C-940218, unreported; State v. Davis (1975), 44 Ohio App.2d 335, 347,338 N.E.2d 793, 803.
[21] See State v. Davis (1975), 44 Ohio App.2d 335, 349, 338 N.E.2d 793,804.
[22] See App.R. 12.
[23] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.