[Cite as *State v. Emrath*, 2013-Ohio-4231.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Sheila G. Farmer, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| -vs- | : | |
| | : | |
| BRYAN EMRATH | : | Case No. 12CA110 |
| | : | |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Richland County
                            Court of Common Pleas, Case No.
                            2012-CR-276D

JUDGMENT:                   Affirmed

DATE OF JUDGMENT:           September 23, 2013

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

BRENT N. ROBINSON                     R. JOSHUA BROWN
Richland County                       32 Lutz Avenue
First Assistant Prosecutor            Lexington, OH 44904
38 South Park Street
Mansfield, OH 44902

*Baldwin, J.*

{¶1}    Appellant Bryan Emrath appeals a judgment of the Richland County Common Pleas Court convicting him of two counts of murder (R.C. 2903.02(A),(B)) with a firearm specification (R.C. 2929.14(D)(1)).  Appellee is the State of Ohio.

## STATEMENT OF FACTS AND CASE

{¶2}    In January of 2012, appellant met Rachel Kiser through an online dating site called Plenty of Fish.  Rachel moved in with appellant shortly thereafter.

{¶3}    By his own admission, appellant has never held a steady job, nor has he paid child support for his three children, ages six years, three years, and one year.  Rachel worked at O'Bryan's Pub, a bar and restaurant in Ashland.

{¶4}    On April 27, 2012, Rachel went to her job at O'Bryan's Pub.  During the day, she checked her phone frequently for messages from appellant.  She told a coworker that appellant did not believe that she was at work.

{¶5}    Appellant spent April 27, 2012, playing an online video game, which he played every day.  He also sold their chinchilla on Craig's List for $70.  He became stressed as the day wore on because his ex-wife did not bring his children over as he expected, he had bills to pay, and he could not take a shower because the water to the apartment had been turned off.  His messages to Rachel throughout the day reveal that he was feeling insecure about the relationship and about Rachel possibly leaving him.

{¶6}    Appellant took his dog for a walk to his sister's house.  From there, appellant's brother-in-law drove him to Circle K, where appellant purchased an eighteen-pack of beer.  He retrieved his dog and walked home, where he continued to

play his online game, looked on Craig's List to trade his gun for a cell phone, and drank beer.

{¶7}    Rachel returned home late that night after her shift ended at O'Bryan's. Appellant had been drinking beer.  While he normally smoked marijuana before bed, he had not yet smoked marijuana when Rachel returned home.  The couple argued. Appellant flipped over a pool table, grabbed his rifle, and shot Rachel twice.  Appellant attempted to call 911 from Rachel's cell phone, but he could not figure out how to unlock the phone.  She had purchased a new phone that day because appellant broke her old phone during a previous argument.

{¶8}    Disturbed at the sound of Rachel gagging on her own blood, appellant left the apartment.  He attempted unsuccessfully to awaken a neighbor to call for help. Appellant then returned to the apartment, figured out how to operate Rachel's phone, and called for help.  He told the dispatcher, "We got in an argument and I shot my girlfriend."

{¶9}    Police and emergency medical personnel responded to the scene.  Rachel was found already deceased in the apartment, with her purse and car keys nearby and the gun a few feet away.  Police cleared appellant's semi-automatic rifle, finding thirteen live rounds and two rounds spent.

{¶10}  Ptl. Jacob Rietschlin of the Mansfield Police Department handcuffed appellant and led him to the cruiser.  While driving appellant to the station, appellant began crying and banging his head against the window.   He asked if Rachel was okay and said that he did not mean to hurt her.

{¶11} At the police station, Officer Terry Rogers prepared to interview appellant. Earlier Officer Rietschlin had asked appellant if he was a Notre Dame fan because appellant had a clover tattooed on his ankle. This question seemed to provoke appellant, who called Rietschlin an "Irish prick," an "Irish fuck", and a "mother-fucker." The officers determined that Rogers had a better rapport with appellant and should therefore talk with him about happened.

{¶12} Patrolman Rogers read appellant his Miranda rights and appellant signed a waiver of his rights, saying he was "fucked anyhow." However, appellant said that he would not give a taped statement without counsel present. He agreed to talk if the statement was not taped. Rogers began preparing paperwork to take appellant to the hospital for blood work. Without questioning from Rogers, appellant told Rogers that he and Rachel argued, he threw the pool table, grabbed his rifle, pointed it at Rachel and pulled the trigger twice.

{¶13} On the way to the hospital, appellant continued to cry and say that he didn't mean to shoot Rachel. At the hospital his emotions were unstable, alternating between anger and sadness. Appellant yelled racial slurs at a group of African-American people in the waiting room, and told officers, "Once I get these cuffs off, I'll fuck you up." He asked Sgt. Joseph Petrycki of the Mansfield Police Department if Rachel was dead. When Petrycki told appellant that she was dead, appellant said to the officer, "Fuck you and your green army pants, you mother-fucker." Appellant said that Rachel did not deserve to die over something stupid, and he deserved the death penalty.

{¶14}   Appellant was indicted by the Richland County Grand Jury with two counts of murder with a firearm specification.

{¶15}   Appellant filed a motion to suppress all statements he made to police as obtained in violation of Miranda.   After a suppression hearing, the court suppressed statements made to Ptl. Rietschlin in response to questioning after appellant was handcuffed, but before he was Mirandized.   The court found that appellant waived his Miranda rights at the police station and agreed to talk as long as his statements were not recorded, which they were not.   The court further found that appellant's unsolicited statements were admissible.

{¶16}   The case proceeded to jury trial in the Richland County Common Pleas Court.   Appellant testified that he intended to commit suicide with the gun, Rachel attempted to grab the gun from him, and the gun went off during the struggle.

{¶17}   The jury convicted appellant as charged in the indictment.   The court found that the second count of murder was an allied offense with the first count. Appellant was sentenced to a term of incarceration of fifteen years to life for murder, and an additional three years on the firearm specification.   He assigns two errors on appeal:

{¶18}   "I. IN SMITH V. ILLINOIS THE U.S. SUPREME COURT HELD AN ACCUSED WHO, DURING CUSTODIAL INTERROGATION, HAS EXPRESSED HIS DESIRE TO DEAL WITH POLICE ONLY THROUGH COUNSEL IS NOT SUBJECT TO FURTHER INTERROGATION BY THE AUTHORITIES UNTIL COUNSEL HAS BEEN MADE AVAILABLE.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY

ALLOWING INTO EVIDENCE STATEMENTS ALLEGEDLY MADE BY APPELLANT WHILE IN POLICE CUSTODY.

{¶19} "II. EVIDENCE RULE 803(3) PROVIDES FOR THE ADMISSIBILITY OF STATEMENTS MADE BY THE DECLARANT CONCERNING HIS THEN EXISTING STATE OF MIND, EMOTIONS, SENSATIONS, OR PHYSICAL CONDITION. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING JAZETTE WINGARD AND SHERYL BUFFMYER TO TESTIFY ABOUT DECEDENT'S COMMENTS REGARDING HER RELATIONSHIP WITH APPELLANT."

I.

{¶20} In his first assignment of error, appellant argues that the court erred in admitting statements he made in the car on the way to the police station, as he was in custody and had not yet been read his Miranda rights. Appellant also argues that the court erred in admitting any statements he made after he indicated to police that he would not give a taped statement without counsel present.

{¶21} In reviewing a trial court's ruling on a motion to suppress, the weight of the evidence and credibility of witnesses are primarily for the trier of fact. *State v. Smith*, 80 Ohio St. 3d 89, 105-106, 684 N.E.2d 668 (1997).

{¶22} A suspect who volunteers information without being asked questions is not subject to a custodial interrogation and is not entitled to Miranda warnings. *State v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997), citing *State v. Roe*, 41 Ohio St.3d 18, 22, 535 N.E.2d 1351 (1989). In other words, "Miranda does not affect the admissibility of '[v]olunteered statements of any kind.' " *Id.*, citing *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶23}   The trial court suppressed statements appellant made in response to Ptl. Rietschlin's question about what happened, as appellant was in custody but had not yet been Mirandized.  However, the evidence reflects that all statements appellant made in the cruiser on the way to the police station were not in response to questioning and were unsolicited by police.  The court did not err in admitting these volunteered statements.

{¶24}   Appellant signed a written waiver of Miranda rights at the police station, but stated that police could not record his statement unless an attorney was present. Appellant told police that he was a criminal justice major and knew that only a recorded statement could be admitted into evidence against him.  Appellant argues that because he invoked his right to counsel, anything he said after that point was inadmissible.

{¶25}   The testimony presented at the suppression hearing demonstrates that after appellant stated that he would not give a taped statement without an attorney present, all questioning ceased.  Ptl. Rogers stayed in the room with appellant but began filling out paperwork necessary for transporting appellant to the hospital for a blood draw.  At that point, appellant volunteered information to Rogers about the shooting.  Likewise, all statements made by appellant at the hospital and on the way to the hospital were unsolicited and not in response to questioning by officers.

{¶26}   "'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, at ¶ 20, quoting *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100

S.Ct. 1682, 64 L.Ed.2d 297. In the instant case, the police did not interrogate appellant. All actions by the police were attendant to arrest and custody, and to transporting appellant to the hospital for blood work. The only statements made by police to appellant concerning the shooting were in response to appellant's questions about the condition of the victim. Once appellant conditionally invoked his right to counsel concerning recorded statements, not only did police not attempt to take a recorded statement from appellant, but they ceased questioning appellant. All further statements the court admitted into evidence were unsolicited statements and not the product of interrogation.

{¶27} The first assignment of error is overruled.

II.

{¶28} In his second assignment of error, appellant argues that the court erred in admitting hearsay statements made by the victim to two of her coworkers concerning her relationship with appellant.

{¶29} Jazzette Wingard and Sheryl Buffmyer both worked with Rachel at O'Bryan's. Jazzette testified that eight days before Rachel was murdered, Rachel told Jazzette that she and appellant were not getting along and had been arguing. Rachel told Jazzette that she was going to leave appellant if he drinks again, as what she goes through when appellant drinks is not worth it. Sheryl Buffmyer testified that on Rachel's last day at work before she was killed, Rachel appeared frustrated and anxious, and when Sheryl asked what was wrong, Rachel responded that appellant did not believe she was coming into work that morning.

{¶30}   Evid. R. 803(3) provides that evidence is not excluded by the hearsay rule if it is a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)."  In *State v. O'Neal*, 87 Ohio St. 3d 402, 411-412, 721 N.E.2d 73 (2000), the Ohio Supreme Court held that statements by a murder victim that she was feeling stressed, was afraid of her husband, and planned to end her marriage were admissible under Evid. R. 803(3).

{¶31}   Rachel's statements to Jazzette that she and appellant had been arguing and she planned to leave appellant were admissible under Evid. R. 803(3).   These statements reflect Rachel's state of mind, and her intent to leave appellant if his drinking continued.

{¶32}   Rachel's statement to Sheryl that appellant did not believe she was at work was not admissible under Evid. R. 803(3), as the statement was not of her own state of mind, but rather was a statement of appellant's state of mind.  However, we find that admission of this statement was harmless error.  Crim. R. 52(A) defines harmless error:  "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."  The test for determining whether the admission of erroneous evidence is harmless requires the reviewing court to look at the whole record, leaving out the disputed evidence, and then to decide whether there is other substantial evidence to support the guilty verdict. *State v. Riffle,* Muskingum App. No.2007–0013, 2007–Ohio-5299 at ¶ 36–37 (Citing *State v. Davis* (1975), 44 Ohio App.2d 335, 347, 338 N.E.2d 793).  The messages appellant sent to Rachel's phone had been admitted into evidence prior to Sheryl's testimony.  In these messages, appellant asked where

she was and indicated a fear that Rachel was lying to him.   Therefore, Sheryl's testimony that Rachel said appellant thought she was lying about being at work was merely cumulative.

{¶33}   The second assignment of error is overruled.   The judgment of the Richland County Common Pleas Court is affirmed.   Costs are assessed to appellant.

By: Baldwin, J.

Hoffman, P.J. and

Farmer, J. concur.

_____
HON. CRAIG R. BALDWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. SHEILA G. FARMER

CRB/rad

[Cite as *State v. Emrath*, 2013-Ohio-4231.]

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff -Appellee | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| BRYAN EMRATH | : | |
| | : | |
| Defendant -Appellant | : | CASE NO. 12CA110 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio is affirmed. Costs assessed to appellant.

 

HON. CRAIG R. BALDWIN

 

HON. WILLIAM B. HOFFMAN

 

HON. SHEILA G. FARMER